FILED

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

2010 MAR 17 PM 4:00

CLERK, US DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA, FLORIDA

UNITED STATES OF AMERICA

v.   CASE NO. 8:10cr-116T26 TGW

AKSAY DENIZCILIK VE TICARET A.S.

33 U.S.C. § 1908(a)
33 C.F.R. § 151.25
18 U.S.C. § 1001
18 U.S.C. § 2

## INFORMATION

The United States Attorney charges:

### COUNT ONE

(Act to Prevent Pollution from Ships, 33 U.S.C. § 1908(a))

#### A. Introduction

At all times material to this Information:

**The Corporate Defendant**

1. Defendant AKSAY DENIZCILIK VE TICARET A.S. ("ASKSAY") was a Turkish corporation with offices at Kat 14, Nida Kule Is Merkezi, Degirmen, Sokak 12, Kozyatagi Mah, Kadikoy, 34742 Istanbul, Turkey. Defendant AKSAY, acting through its agents and employees, who were acting within the scope of their agency and employment and on behalf of Defendant AKSAY, operated and managed the Motor Tanker ("M/T") Kerim.

**The M/T Kerim**

2. The M/T Kerim, a 9,544 gross registered ton vessel, registered under the flag administration of the Marshall Islands and bearing the IMO number 9121754, was operated by AKSAY pursuant to a contract between AKSAY and the vessel's owners.

The M/T Kerim was engaged in international commercial maritime operations and transported bulk chemical products from and to various ports in the United States of America, including Tampa, Florida, and elsewhere.

3. The M/T Kerim had an Engine Department headed by a Chief Engineer assisted by a Second Engineer, Third Engineer, and Fourth Engineer and other licensed engineers from time to time. The Engineers were assisted by laborers (also known as "ratings") who are referred to in the industry as "fitters" and "oilers." The Chief Engineer reported directly to the Master of the vessel and to shore-based managers and had overall responsibility for the operations of the Engine Department, including the supervision of daily operations, formulation and implementation of Engine Department procedures, and verification that all systems, including the Oil Water Separator and incinerator, were functioning properly.

4. The operation of large marine vessels like the M/T Kerim generates large quantities of oily sludge and oily waste water. Oily sludge is generated during, among other things, the process of purifying fuel oil, lubricating oil, and other petroleum products so that these products can be used in the engines on board the vessel. The oily sludge generated as a result of this process must be stored on board the vessel in sludge tanks until it is either burned on board the vessel through the use of an incinerator or auxiliary boiler or offloaded onto barges or shore-side facilities for disposal. Engine department operations also generate large quantities of waste oil due to leaks and drips from the engines' lubrication and fuel systems. This waste oil combines with water, detergents, solvents, and other wastes that accumulate in the bottom or the "bilges" of the vessel to form oily waste water. This oil-contaminated bilge

waste must be collected, stored, and then processed to separate the water from the oil and other wastes using a pollution prevention control device known as an Oil Water Separator. After passing through the Oil Water Separator, engineering space oily waste water containing less than fifteen (15) parts per million ("ppm") of oil may be discharged overboard. If a sensor detects more than 15 ppm oil in the waste after it has been processed through the Oil Water Separator, it will send a signal to a three-way valve which will then redirect that effluent to a storage tank onboard the vessel.

## B. Legal Framework

5. The United States is part of an international regime that regulates the discharge of oil from vessels at sea: the International Convention for the Prevention of Pollution from Ships, as modified by the Protocol of 1978 (hereafter, the "MARPOL Protocol"). The MARPOL Protocol is embodied in numerous agreements that the United States has ratified and has been implemented in the United States by the "Act to Prevent Pollution from Ships" ("APPS"), 33 U.S.C. § 1901, et seq. APPS makes it a crime for any person to knowingly violate the MARPOL Protocol, APPS, or regulations promulgated under APPS. These regulations apply to all commercial vessels operating in United States waters or while at a port or terminal under the jurisdiction of the United States, including vessels operating under the authority of a country other than the United States.

6. MARPOL and APPS set the legal standard for the maximum amount of oil permitted to be discharged overboard by a vessel, namely, 15 ppm. Therefore, under MARPOL, wastes can be discharged overboard into the ocean only if they contain less than 15 ppm of oil. MARPOL also requires that vessels use an oil-sensing device (or oil

3

content meter), such as the found on an Oil Water Separator, to prevent the discharge of a mixture containing more than the legally permitted concentration of oil.

7. Consistent with the requirements contained in MARPOL, the APPS regulations require that each vessel of more than 400 gross tons maintain a record known as an Oil Record Book. In this Oil Record Book, transfers of oil, the disposal of sludge and waste oil, and overboard discharges of bilge water that have accumulated in machinery spaces, and thus are contaminated with oil, must be fully and accurately recorded by the person in charge of the operations. 33 C.F.R. § 151.25(d). The Oil Record Book must also record any emergency, accidental, or other exceptional discharges of oil or mixtures. 33 C.F.R. § 151.25(g). The Oil Record Book must be maintained on board the vessel for not less than three years, and be readily available for inspection at all reasonable times. 33 C.F.R. § 151.25(k).

8. The United States Coast Guard (U.S. Coast Guard), an agency of the United States Department of Homeland Security, is charged with enforcing the laws of the United States and is empowered under Title 14, United States Code, Section 89(a) to board vessels and conduct inspections and investigations of potential violations and to determine compliance with the MARPOL Protocol, APPS, and related regulations. The U.S. Coast Guard can conduct Port State Control Examinations, which involve boarding a vessel and conducting inspections and investigations of potential violations of the law. Failure to comply with international standards, including MARPOL, can form the basis of an order to refuse to allow a vessel to enter port, or to prohibit the vessel from leaving port without remedial action until it determines that the vessel does not present an unreasonable threat to the marine environment. 33 C.F.R. § 151.07(b) and

151.25(b). In conducting their inspections, U.S. Coast Guard personnel rely on the statements of the vessel's crew and documents, including information contained in the Oil Record Book. The U.S. Coast Guard is specifically authorized to examine a vessel's Oil Record Book to determine, among other things, whether the vessel has operable pollution prevention equipment and appropriate procedures, whether is poses any danger to United States ports and waters, and whether the vessel had discharged any oil or oily mixtures in violation of MARPOL, APPS, or any other applicable federal regulation. 33 C.F.R. § 151.23(a)(3) and (c).

### C. The Violation

9. On or about March 24, 2009, and within the navigable waters of the United States in the Middle District of Florida, the defendant,

AKSAY DENIZCILIK VE TICARET A.S.,

acting through its agents and employees, who were acting within the scope of their agency and employment, and on behalf of defendant AKSAY DENIZCILIK VE TICARET A.S., did knowingly fail to maintain an Oil Record Book for the M/T Kerim in which all disposals of oil residue and overboard discharges were required to be fully recorded. Specifically, the defendant maintained an Oil Record Book that failed to disclose at least one overboard discharge of oily sludge made through bypass equipment and without properly functioning oil monitoring equipment that created the overall false and misleading impression that the vessel was being operated properly and was fully maintaining an accurate Oil Record Book.

All in violation of Title 33, United States Code, Section 1908(a), Title 18, United States Code, Section, and Title 33, Code of Federal Regulations, Section 151.25.

## COUNT TWO

## (False Statement - 18 U.S.C. § 1001(a)(3))

10. Part A of Count One of this Information is specifically incorporated and re-alleged herein.

11. On or about March 24, 2009, in the Port of Tampa, Florida and within the navigable waters of the United States in the Middle District of Florida, the defendant,

AKSAY DENIZCILIK VE TICARET A.S.,

acting through its agents and employees, who were acting within the scope of their agency and employment, and on behalf of defendant AKSAY DENIZCILIK VE TICARET A.S., in a matter within the jurisdiction of the United States Coast Guard and the Department of Homeland Security, did knowingly and willfully use and cause to be used a materially false writing, to wit, the Oil Record Book for the M/T Kerim, knowing the same to contain a materially false, fictitious, and fraudulent statement, entry and representation, in that the Oil Record Book for the M/T Kerim failed to state and omitted the fact that sludge waste had been discharged directly overboard, when in truth and in fact as the defendant then and there well knew, some volume of the oil-contaminated sludge not recorded in the Oil Record Book had been discharged overboard through a bypass pipe.

7

All in violation of Title 18, United States Code, Section 1001(a)(3), and Title 18, United States Code, Section 2.

A. BRIAN ALBRITTON
United States Attorney

By: *(signature)*
TERRY A. ZITEK
Assistant United States Attorney

By: *(signature)*
ROBERT T. MONK
Assistant United States Attorney
Deputy Chief, Economic Crimes


IGNACIA S. MORENO
Assistant Attorney General
Environmental and Natural Resources
Division - U.S. Department of Justice

By: *(signature)*
KENNETH E. NELSON
Trial Attorney
Environmental Crimes Section
U.S. Department of Justice